KIM HO MA, Petitioner–Appellee,

v.

John D. ASHCROFT, Attorney General; and Robert S. Coleman, Jr., District Director of the Immigration and Naturalization Service, Seattle, Washington, Respondents–Appellants.

No. 99–35976.

United States Court of Appeals, Ninth Circuit.

July 27, 2001

Quynh Vu, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent-appellant.

Jennifer Wellman (argued), Jay Warren Stansell, Federal Public Defender's Office, Seattle, Washington, for the petitioner-appellee.

George A. Cumming, Jr., San Francisco, CA, for amicus Law Professors.

Todd Burns, San Diego, CA, for amicus National Association of Criminal Defense Lawyers.

William J. Aceves, San Diego, CA, for amici Human Rights Watch, Human Rights Advocates, the Jesuit Refugee Service, the World Organization Against Torture USA, and the Extradition and Human Rights Committee of the American Branch of the International Law Association.

Carolyn M. Wiggin, Sacramento, CA, for amicus Federal Public Defender.

Frank Tse, San Francisco, CA, for amicus Southeast Asia Resource Action Center.

Before: REINHARDT, THOMPSON, and T.G. NELSON, Circuit Judges.

REINHARDT, Circuit Judge:

### A. Opinion Following Remand

■ We previously issued an opinion in this case, which is reported at 208 F.3d 815 (9th Cir.2000).[1] Following the issuance of our opinion, the Supreme Court granted certiorari, consolidated this case with *Zadvydas v. Underdown*, 185 F.3d 279 (5th Cir.1999), and issued an opinion in the consolidated cases *sub nom. Zadvydas v. Davis*, — U.S. —, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). In *Zadvydas*, the Court essentially adopted the reasoning set forth in our opinion, and held that 8 U.S.C. § 1231(a)(6) does not authorize detention of an alien, pending removal, indefinitely. The Court further held that following issuance of a final order of removal there is a "presumptively reasonable" period of six months during which the INS may continue to detain an alien it is seeking to remove. *Id.* at 2505. Thereafter detention is lawful only if there is a "significant likelihood of removal in the reasonably foreseeable future." *Id.* The Court vacated our decision, however, because, it stated: "[our] conclusion may have rested solely upon the 'absence' of an 'extant or pending' repatriation agreement without giving due weight to the likelihood of successful future negotiations." *Id.* Immediately preceding its order, the Court set forth the applicable law as follows:

> While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months. *See* Juris. Statement of United States in *United States v. Witkovich*, O.T.1956, No. 295, pp. 89. Consequently, for the sake of uniform administration in the federal courts, we recognize that period. After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts

---

1. The caption, however, has been changed. John Ashcroft is substituted for his predecessor, Janet Reno, as Attorney General of the United States; and Robert S. Coleman, Jr. is substituted for his predecessor, Robert C. Smith, as District Director of the Immigration and Naturalization Service, Seattle, Washington. Fed. R.App. P. 43(c)(2).

as the reasonably foreseeable future conversely would have to shrink. This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the "reasonably foreseeable future." *Id.*

In response to the Court's order of remand, we now reissue our opinion with the following clarification: Our conclusion that there was no likelihood of Ma's removal in the reasonably foreseeable future was based, and is based, not only on the fact that there was no "extant or pending" repatriation agreement but also on the fact that there was an insufficient showing that future negotiations were likely to lead to a repatriation agreement within the reasonably foreseeable future. In reaching our conclusion we carefully reviewed the record, including the findings of the District Court. The District Court, after full briefing by the parties and the State Department, found that the government's efforts to effect some form of repatriation agreement with Cambodia, Ma's native land, were in an embryonic stage, that the efforts had met with no response from the Cambodian government, and that by our government's own admission, the negotiation of a repatriation agreement with Cambodia depended upon the status of similar negotiations with Vietnam. The District Court further found that discussions with Vietnam had been conducted over the past four or five years without any resolution and that two judges in the same district court had recently determined that the Vietnam discussions had no realistic chance of success. The District Court concluded that there was no "realistic chance" that Ma would be removed and that his detention was "indefinite." The District Court's decision was issued on September 29, 1999, well after the six-month presump-

tively reasonable period established by the Court in *Zadvydas v. Davis,* and in fact, at a time when Ma had been detained for more than 11 months following his final order of removal. In our prior opinion, we affirmed, and we reaffirm here, the District Court's finding that, under all the circumstances, there was no likelihood of Ma's removal in the foreseeable future.

In light of the above clarification, and to make our earlier holding clear, we amend our opinion by deleting the sentence, 208 F.3d at 831, that reads:

> In the absence of a repatriation agreement, extant or pending, we must affirm the district court's finding that there is no reasonable likelihood that the INS will be able to accomplish Ma's removal.

We substitute in its place the following sentence:

> Under these circumstances, we affirm the district court's finding that there is no reasonable likelihood that the INS will be able to accomplish Ma's removal in the reasonably foreseeable future.

Immediately after the above sentence, we add the following sentence: "Ma's detention has already lasted well beyond the six-month 'presumptively reasonable' period established by the Supreme Court in *Zadvydas.*"

In addition, we amend our opinion to incorporate throughout the 6–month "presumptively reasonable" period adopted by the Supreme Court in *Zadvydas* by adopting the changes described below. We substitute the phrase "for more than a 'reasonable period' beyond the removal period" for the phrase "beyond that statutory removal period" at the end of the sentence, 208 F.3d. at 819, which reads:

> More specifically, in cases like Ma's, in which there is no reasonable likelihood that the alien will be removed in the reasonably foreseeable future, we hold

that it may not detain the alien beyond that statutory removal period.

We add the following footnote at the end of that sentence, 208 F.3d at 819:

*Footnote 5.* In our original opinion, we indicated that the determination of a "reasonable period" beyond the 90–day statutory removal period would be unique to the circumstances of each individual case. However, in *Zadvydas,* 121 S.Ct. at 2505, the Supreme Court read the statute to permit a "presumptively reasonable" detention period of *six months* after a final order of removal— that is, *three months* after the statutory removal period has ended. Thereafter, as the Court stated, "for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the reasonably foreseeable future conversely would have to shrink." *Id.* Accordingly, all references in this opinion to the "reasonable period" or "reasonable time period" beyond the 90–day statutory period shall be understood to incorporate the additional three months, and thereby to refer to a *six-month* "presumptively reasonable" detention period.

We substitute the phrase "for more than a reasonable period beyond that removal period" for the phrase "beyond the statutory removal period" in the following sentence, 208 F.3d at 822:

In cases in which an alien has already entered the United States and there is no reasonable likelihood that a foreign government will accept the alien's return in the reasonably foreseeable future, we conclude that the statute does not permit the Attorney General to hold the alien beyond the statutory removal period.

We add the following internal cross-reference after that sentence: "See n. 5, *supra.*" We substitute the phrase "that time"for the phrase "that statutory remov-

al period" in the sentence, 208 F.3d at 827, that reads:

We believe the construction of § 1231(a)(6) we adopt—that the INS may detain aliens who have entered the country but have been ordered removed only for "a reasonable time" beyond the ninety day statutory removal period, and specifically, that such aliens may not be detained beyond that statutory removal period if there is no reasonable likelihood that their country of origin will permit their return in the reasonably foreseeable future—to be the most plausible reading of the statute.

We substitute the phrase "presumptively reasonable detention period" for the phrase "statutory removal period. 8 U.S.C. § 1231(a)(1)(A)," in the sentence, 208 F.3d at 828, which reads:

Because, here, there is no repatriation agreement and no demonstration of a reasonable likelihood that one will be entered into in the near future, we believe it to be not only the prudent but the correct interpretation of the statute to hold that Ma and others similarly situated aliens must be released, under supervision, at the end of the statutory removal period. 8 U.S.C. § 1231(a)(1)(A).

Finally, we delete the sentences (and the accompanying footnote), 208 F.3d at 830 & n. 29, which read:

Here, we need not address all the conceivable situations that could arise to delay or preclude removal. We need hold only that where it is reasonably likely that an alien who has entered the United States cannot be removed in the reasonably foreseeable future, detention beyond the removal period is not justified.

and substitute in their place:

The Supreme Court has now held that there shall be a presumptively reasonable period of six months during which

an alien may be detained pending removal. After this six-month period, the alien can no longer be held if removal is not likely to occur in the reasonably foreseeable future. The Court also concluded that what counts as the "reasonably foreseeable future" diminishes as the time of confinement increases. *Zadvydas,* 121 S.Ct. at 2505.

Accordingly we reinstate our opinion, as amended, and set it forth below.

## B. Reinstated Opinion (as amended)

Petitioner Kim Ho Ma is an alien who left his native land, Cambodia, as a refugee at the age of two and has resided in the United States as a legal permanent resident since he was six. At the age of seventeen he was involved in a gang-related shooting, and was convicted of manslaughter. After completing his prison sentence some two years later, he was taken into INS custody and ordered removed because of that conviction. However, the INS has been unable to remove

him, and hundreds of others like him, because Cambodia does not have a repatriation agreement with the United States and therefore will not permit Ma's return.[2] The question before us is whether, in light of the absence of such an agreement, the Attorney General has the legal authority to hold Ma, who is now twenty two, in detention indefinitely, perhaps for the remainder of his life.

■ Ma challenged his detention by filing a petition for habeas corpus, under 28 U.S.C. § 2241, in the District Court for the Western District of Washington. That court ruled that Ma's continued detention violates his substantive due process rights under the Fifth Amendment.[3] Respondents, the Immigration and Naturalization Service, Janet Reno (as Attorney General), and Robert Coleman (as INS Acting District Director in Seattle) (hereinafter collectively referred to as "INS") appeal the district court's decision releasing Ma from INS custody. We have jurisdiction[4] and affirm, but on a different basis.

2. There are also many aliens from Laos and Vietnam who cannot be removed because our government has no repatriation agreement with those countries.

3. In the district court in which Ma sought relief, over one hundred habeas corpus petitioners challenged their ongoing detention by the INS in cases similar to his. The district court designated five lead cases that presented issues common to all petitioners and directed the parties to brief and argue those issues before five district court judges. The five district court judges issued a joint order establishing a legal framework to apply in each individual case. A single judge then applied this ruling to Ma and held that he should be released. Similar cases involving a large number of habeas petitioners have arisen in Nevada, and the Central, Eastern, and Southern Districts of California.

4. Although neither party has argued either that the district court lacked jurisdiction over Ma's constitutional claims or that this court lacks jurisdiction to hear this appeal, the INS

argued at one point in its brief that the general federal habeas statute, 28 *U.S.C.* § 2241, does not provide jurisdiction to hear any claim of statutory error or abuse of discretion. However, our recent decision in *Magana–Pizano v. INS,* 200 F.3d 603 (9th Cir.1999), makes clear that the scope of review under the general federal habeas statute, 28 U.S.C. § 2241, has not been limited by 8 U.S.C. § 1252, because that section does not mention habeas corpus explicitly. *Id.* at 609 (citing *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996)). Claims of statutory error and abuse of discretion in the application of the immigration laws have long been cognizable on habeas corpus. *See Magana–Pizano,* 200 F.3d at 609 (holding that general habeas statute allows review of statutory questions); *United States ex. rel Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (reviewing denial of discretionary relief (suspension of deportation) on the merits, and reversing on ground that discretion was not exercised consistent with the statute). Thus, we hold that 8 U.S.C. § 1252 does not preclude us from considering Ma's

■ We hold that the INS lacks authority under the immigration laws, and in particular under 8 U.S.C. § 1231(a)(6), to detain an alien who has entered the United States for more than a reasonable time beyond the normal ninety day statutory period authorized for removal. More specifically, in cases like Ma's, in which there is no reasonable likelihood that the alien will be removed in the reasonably foreseeable future, we hold that it may not detain the alien for more than a "reasonable period" beyond the removal period.[5] Because we construe the statute as not permitting the indefinite detention of aliens like Ma, we need not decide the substantial constitutional questions raised by the INS's indefinite detention policy.

## I.

Petitioner Kim Ho Ma's family fled Cambodia in 1979 and took Ma, who was then two years old, with them. After spending over five years in refugee camps, Ma's family lawfully entered the United States in 1985 as refugees. Ma's status was adjusted to that of a lawful permanent resident in 1987. In 1996, he was convicted, by a jury, of first degree manslaughter following a gang-related shooting. He was sentenced to 38 months in prison, but eventually served only 26 after receiving credit for good behavior. He was tried as an adult, although he was only seventeen years of age at the time of the crime. Although the INS repeatedly refers to

Ma's criminal record, this was his only criminal conviction.

Ma's conviction made him removable as an alien convicted of certain crimes under 8 U.S.C. § 1227(a)(2). Because he was released by the state authorities after April 1, 1997, the INS's authority to take him into custody was governed by the permanent custody rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) (codified at 8 U.S.C. § 1231). The INS took Ma into custody following his release from prison and initiated removal proceedings against him. An immigration judge found Ma removable, and furthermore found him ineligible for asylum or withholding of deportation because of his conviction. Ma appealed this ruling to the Board of Immigration Appeals (BIA). The BIA affirmed the immigration judge's decision. Although Ma's order of removal became final on October 26, 1998, the INS could not remove him within the ninety day period during which it is authorized to do so because the United States had, and still has, no repatriation agreement with Cambodia. As a result, Ma remained in detention until he filed this petition for a writ of habeas corpus, which was granted by the district court on September 29, 1999. He is now twenty-two and has been in custody (and, but for the district court's decision, would have been incarcerated) for nearly five years, although his sentence accounts for only a little over two years of that period.

non-constitutional arguments on habeas corpus.

**5.** In our original opinion, we indicated that the determination of a "reasonable period" beyond the 90–day statutory removal period would be unique to the circumstances of each individual case. However, in *Zadvydas*, 121 S.Ct. at 2505, the Supreme Court read the statute to permit a "presumptively reasonable" detention period of *six months* after a final order of removal—that is, *three months*

after the statutory removal period has ended. Thereafter, as the Court stated, "for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the reasonably foreseeable future conversely would have to shrink." *Id.* Accordingly, all references in this opinion to the "reasonable period" or "reasonable time period" beyond the 90–day statutory period shall be understood to incorporate the additional three months, and thereby to refer to a *six-month* "presumptively reasonable" detention period.

In addition to filing the habeas petition we now review, Ma made several other attempts to secure his release. During the pendency of the proceedings before the immigration judge and the BIA, Ma filed two motions to be released on bond—in October and December 1997. In both instances an immigration judge denied Ma's requests, finding, based solely on the offense he committed at the age of seventeen, that although he was not a flight risk, he was a danger to the community.

In May 1999, over six months after Ma's final removal order (and after his habeas petition was filed), the INS, by letter, requested travel documents for Ma from the Cambodian government.[6] The next day, the INS conducted the "ninety day" custody review, as provided for in its regulations, to determine if Ma should be released on bond.[7] An INS officer prepared a report after interviewing Ma and reviewing letters and other materials submitted by his family and friends. The officer's report stated that Ma's family was "very supportive," and that if Ma was released he would be able to assist his handicapped 71 year old father in everyday activities. The report also stated that Ma constantly communicates with his younger brother to assure that his brother "does not follow in his footsteps." In addition, the report noted that Ma's older brother runs his own business and would employ Ma if he were released from custody. A deputy district director then reviewed the INS officer's report and issued a decision denying Ma's release. The decision was sent to Ma by means of a form letter that stated that the deputy director made his decision after considering a set of factors set out in INS regulations;[8] however the letter neither stated reasons nor discussed which factors were relied upon in reaching the decision to deny Ma's release. The letter added that "there is no appeal from this decision."[9]

On September 30, 1999, pursuant to additional internal regulations, the INS again reviewed its decision to continue detaining Ma.[10] Once again, INS officials found that Ma should remain in detention, based on the seriousness of his conviction and also on the ground of his threatened participation in a hunger strike while in custody. The reviewers stated that they were unable to conclude that Ma would "remain non-violent" and abide by the terms of his release. These decisions were made despite abundant information in the administrative record about Ma's relationships with his parents and siblings, employment prospects, and plans to avoid gang relations and criminal behavior. Upon reviewing Ma's habeas petition, the district court ruled that Ma's detention was unconstitutional on "substantive due process"

---

6. The Cambodian government denied the request, as it does all such requests, because of the absence of a repatriation agreement.

7. Internal INS regulations (known as the "Pearson I" regulations) required that Ma's case be reviewed before the end of the ninety day period. However, Ma received his custody review approximately 100 days after that period had run (190 days after his removal order became final).

8. 8 C.F.R. § 241.4.

9. The letter also stated that Ma's case would be reviewed again six months from the date of the letter, on December 2, 1999. It also stated that Ma had the right to submit a request for redetermination of his custody status at any time.

10. After Ma and the other four lead petitioners prevailed in district court, the INS implemented additional regulations, known as the "Pearson II" regulations, which provided for additional review of custody decisions. These regulations provide for review of the decisions of district directors by INS Headquarters, which was then done in this case.

grounds and ordered him released pending the outcome of this appeal. This court and the Supreme Court denied the INS's requests for a stay of the district court's release order.[11] The INS now appeals the district court's decision granting Ma's habeas corpus petition.

## II.

Although the bulk of the parties' arguments, as well as the district court's ruling, address the constitutionality of the INS's detention policy, we must first determine whether Congress provided the INS with the authority to detain Ma indefinitely, as the Attorney General contends.

In general, after an alien is found removable, the Attorney General is required to remove that alien within ninety days after the removal order becomes administratively final.[12] Many aliens, however, cannot be removed within the ninety day period for various reasons. First, some individual cases may simply require more time for processing. Second, there are cases involving aliens who have been ordered removed to countries with whom the United States does not have a repatriation agreement, such as Cambodia, Laos, and Vietnam. Finally, there may be those aliens whose countries refuse to take them for other reasons, and yet others who may be effectively "stateless" because of their race and/or place of birth.[13] Ma falls in the second category.

Under the statute, aliens who cannot be removed at the end of ninety days fall into two groups. Those in the first group must be released subject to supervisory regulations that require them, among other things, to appear regularly before an immigration officer, provide information to that official, notify INS of any change in their employment or residence within 48 hours, submit to medical and psychiatric testing, and comply with substantial restrictions on their travel. 8 U.S.C. § 1231(a)(3). Those in the second group *"may be detained beyond the removal period"* and, if released, shall be subject to the same supervisory provisions applicable to aliens in the first group. 8 U.S.C. § 1231(a)(6).[14] Aliens in the second group include, among others, persons removable because of criminal convictions (such as drug offenses, certain crimes of moral turpitude, "aggra-

---

11. The INS sought to stay the district court's release order. The district court denied the order but granted the INS a temporary stay so that it might attempt to secure an emergency stay from this court. We denied the stay. The INS filed a second emergency stay request, pending appeal to the Supreme Court. We again denied the stay and ordered Ma released. He was released that evening. The INS then sought a stay from the Supreme Court. Justice O'Connor ordered a temporary stay pending a review by the whole Court. Ma surrendered to INS custody pending the Court's decision. The Court denied the INS's stay request, and Ma was again ordered released.

12. *See* 8 U.S.C. § 1231(a)(1)(A)-(B). If the removal order is stayed pending judicial review, the ninety day period begins running after the reviewing court's final order. 8 U.S.C. § 1231(a)(1)(B)(ii).

13. *See, e.g., Caranica v. Nagle,* 28 F.2d 955 (9th Cir.1928) (involving deportation order to Greece of alien born in Macedonia, which was then a Turkish province that was later partitioned among several countries, including Greece, where Greece would not recognize alien as a citizen).

14. The sub-section provides in full that

[a]n alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

8 U.S.C. § 1231(a)(6).

vated felonies," firearms offenses, and various other crimes). 8 U.S.C. § 1227(a)(2). Ma's criminal conviction places him in the second group.

 INS argues that its authority to "detain beyond the removal period" gives it the authority to detain *indefinitely* aliens who fall in the second group and who cannot be removed in the reasonably foreseeable future.[15] Ma argues the opposite—that the INS's authority to detain aliens beyond the removal period does not extend to cases in which removal is not likely in the reasonably foreseeable future. On its face, the statute's text compels neither interpretation: while § 1231(a)(6) allows for the detention of group two aliens "beyond" ninety days, it is silent about how long beyond the ninety day period such detention is authorized. Thus, any construction of the statute must read in some provision concerning the length of time beyond the removal period detention may continue, whether it be "indefinitely," "for a reasonable time," or some other temporal measure.

 We hold that Congress did not grant the INS authority to detain indefinitely aliens who, like Ma, have entered the United States and cannot be removed to their native land pursuant to a repatriation agreement. To the contrary, we construe the statute as providing the INS with authority to detain aliens only for a reasonable time beyond the statutory removal period. In cases in which an alien has already entered the United States and there is no reasonable likelihood that a foreign government will accept the alien's return in the reasonably foreseeable future, we conclude that the statute does not permit the Attorney General to hold the alien for more than a reasonable period beyond that removal period. See n. 5, *supra.* Rather, the alien must be released subject to the supervisory authority provided in the statute.

We adopt our construction of the statute for several reasons. First, and most important, the result we reach allows us to avoid deciding whether or not INS's indefinite detention policy violates the due process guarantees of the Fifth Amendment. Second, our reading is the most reasonable one—it better comports with the language of the statute and permits us to avoid assuming that Congress intended a result as harsh as indefinite detention in the absence of any clear statement to that effect. Third, reading an implicit "reasonable time" limitation into the statute is consistent with our case law interpreting a similar provision in a prior immigration statute. Finally, the interpretation we adopt is more consonant with international law.[16]

---

**15.** Although we recognize that, in general, the Attorney General's interpretation of the immigration laws is entitled to substantial deference, *INS v. Aguirre–Aguirre*, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999), we have held that *Chevron* principles (*Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)) are not applicable where a substantial constitutional question is raised by an agency's interpretation of a statute it is authorized to construe. *Williams v. Babbitt*, 115 F.3d 657, 661–63 (9th Cir.1997) (analyzing *DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) and *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), noting the agency's lack of constitutional expertise, and concluding that "just as we will not infer from an ambiguous statute that Congress meant to encroach on constitutional boundaries, we will not presume from ambiguous language that Congress intended to authorize an agency to do so"). As we explain *infra.*, the agency's interpretation raises just such a substantial question.

**16.** Petitioner also contests the procedures used by INS when considering his requests for release, asserting that they violate procedural due process. Given our holding, we need not reach that constitutional question either.

## III.

■ The Supreme Court has long held that courts should interpret statutes in a manner that avoids deciding substantial constitutional questions. *DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *United States v. Jin Fuey Moy*, 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916); *see also United States v. Bulacan*, 156 F.3d 963, 974 (9th Cir.1998). We have referred to this rule as a "paramount principle of judicial restraint." *United States v. Restrepo*, 946 F.2d 654, 673 (9th Cir.1991).

In the immigration context, courts have often read limitations into statutes that appeared to confer broad power on immigration officials in order to avoid constitutional problems. For example, in *United States v. Witkovich*, 353 U.S. 194, 199, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957), the Court read a limitation into a statute authorizing the INS to ask questions and receive information from deportable aliens within the United States. Because constitutional problems would have arisen if the statute were read as penalizing aliens who refused to answer questions that were irrelevant to any legitimate governmental purpose, the Court chose to read a limitation into the statute. *Witkovich*, 353 U.S. at 199, 77 S.Ct. 779.

We followed *Witkovich* in *Romero v. INS*, 39 F.3d 977 (9th Cir.1994), which involved an alien who had lied to an INS official, thereby rendering her deportable because she violated a condition of her immigration status. The condition required that she answer truthfully all questions put to her by INS officials. However, the questions she did not answer truthfully were irrelevant to her visa status. Although the provision at issue stated that aliens who failed to comply with the conditions of their status were deportable, without defining those conditions in any way, we read into the statute a limitation on the kinds of conditions that the Attorney General could place on aliens. *Id.* at 979–80. Invoking the canon of constitutional avoidance, we concluded that the alien could not be required to answer questions having nothing to do with her visa status. *Id.* at 981; *cf. Jean v. Nelson*, 472 U.S. 846, 854–56, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (holding that immigration parole regulation does not permit race discrimination in order to avoid reaching constitutional question); *Tashima v. Administrative Office of the U.S. Courts*, 967 F.2d 1264, 1271 (9th Cir.1992) (interpreting statute stating that Office "may" provide representation to judges as requiring interpretation based upon criteria not listed in the statute, in order to avoid constitutional problems).

■ Of course, as the Supreme Court has noted repeatedly when formulating the canon of constitutional avoidance, the rule applies when the constitutional issue at hand is a substantial one.[17] The INS contends that the answer to Ma's constitutional challenge is dictated by a straightforward application of our en banc

---

17. The Court has also described the canon as applying to "difficult," "serious," or "grave" constitutional issues. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839, 875, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Allentown Mack Sales v. NLRB*, 522 U.S. 359, 387, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (Rehnquist, CJ, concurring in part and dissenting in part); *Jones v. United States*, 526 U.S. 227, 239, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). Regard-

less of the terminology used, the point seems to be the same: a party cannot force us to ignore the usual canons of statutory construction by raising a frivolous, insubstantial, or patently incorrect constitutional argument. Nor, as the Court put it in *United States v. Locke*, 471 U.S. 84, 96, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985), may we resort to "disingenuous evasion" in our interpretation of the statute to avoid a constitutional question.

decision in *Barrera–Echavarria v. Rison*, 44 F.3d 1441 (9th Cir.1995) (en banc), and the Supreme Court's decision in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953).[18] If this were correct, we would not need to invoke the canon of constitutional avoidance. However, those cases deal with a significantly different problem from the one we avoid here. Both *Mezei* and *Barrera–Echavarria* involved excludable aliens rather than aliens who have already entered the United States. As a result, the constitutional analysis in both cases rests on a doctrine known as the "entry fiction," which authorizes the courts to treat an alien in exclusion proceedings as one standing on the threshold of entry, and therefore not entitled to the constitutional protections provided to those within the territorial jurisdiction of the United States. Both decisions were entirely explicit in their reasoning on this point. In *Mezei*, the Court relied on the entry fiction (that an excludable alien has not entered the United States) in holding that an excludable alien is not entitled to procedural due process:

> It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. But an alien on the threshold of initial entry stands on a different footing: Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned....
>
> Neither respondent's harborage on Ellis Island nor his prior residence here transforms this into something other than an exclusion proceeding.

*Id.* at 212–13, 73 S.Ct. 625 (internal citations omitted). While the Court held that Mezei could be detained indefinitely on Ellis Island, because no country would take him back, it rested its holding on the fact that Mezei's exclusion did not violate the immigration statute, and that as an alien who had not yet entered the country he had no other rights.[19]

We followed *Mezei* in *Barrera–Echavarria*, which involved a Mariel Cuban who was detained while excluded from the U.S.[20] After describing the petitioner's argument and noting our disagreement, we began our analysis by relying on the historic distinction between excludable and resident aliens:

> In doing so, the Court distinguished, on its facts, its then-recent decision in *Kwong Hai Chew v. Colding*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953), which authorized such assimilation of status under some circumstances. *Mezei*, 345 U.S. at 213–14, 73 S.Ct. 625. There is no doubt that Mezei was considered by the Court to be an excludable alien who had not entered the U.S., despite what the Court referred to as his "prior residence here." *See Mezei*, at 212–13, 73 S.Ct. 625.

---

**18.** The INS also makes repeated reference to *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952). However, *Carlson* upheld the constitutionality of detention pending the INS's decision whether to deport an alien, and expressly noted that the problem of "unusual delay" was not before it, and referenced a case involving a Russian petitioner who alleged that his country would not accept his return. *Id.* at 546, 72 S.Ct. 525 (citing *United States ex rel. Potash v. District Director*, 169 F.2d 747, 748 (2d Cir.1948)).

**19.** Although the INS notes that the plaintiff in *Mezei* was previously a lawful resident of the U.S. for twenty-five years, the Court made clear that he was to be treated as an excludable alien because of his long departure from the U.S., and could not have his status "assimilated" to that of a permanent resident.

**20.** Barrera–Echavarria was paroled while excluded, committed numerous crimes, and thereafter was taken back into custody. *Barrera–Echavarria*, 44 F.3d at 1444. His parole did not constitute an entry. *Leng May Ma v. Barber*, 357 U.S. 185, 188, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958).

The Supreme Court has consistently recognized that our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality. In the latter instance, the Court has recognized additional rights and privileges not extended to those in the former category.

*Barrera–Echavarria,* 44 F.3d at 1448 (quotations omitted, alteration in original). We also quoted a passage from *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), stating that "once an alien gains admission to our country and begins to develop the ties that go with permanent` residence, his constitutional status changes accordingly." *Barrera–Echavarria,* 44 F.3d at 1449.[21] Shortly after this quotation, we noted that

Noncitizens who are outside United States territories enjoy very limited protections under the United States Constitution. [citing *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) and *Johnson v. Eisentrager*] Because excludable aliens

are deemed under the entry doctrine not to be present on United States territory, a holding that they have no substantive right to be free from immigration detention reasonably follows.

*Barrera–Echavarria,* 44 F.3d at 1450.

■■■■ Thus, it is not surprising that *Barrera–Echavarria* upheld as constitutional the long-term detention of aliens who had *not* entered the United States, legally or illegally (although they had been paroled into this country). As we stated in that case, it is "not settled" that excludable aliens have any constitutional rights at all, *id.* at 1449, so it is clear that they cannot prevail where the government refuses to admit them.[22] In contrast to *Mezei* and *Barrera–Echavarria,* numerous cases establish that once an alien has "entered" U.S. territory, legally or illegally, he or she has constitutional rights, including Fifth Amendment rights. *See, e.g., Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (stating that "[t]here are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, lib-

**21.** Amici Law Professors note in their brief that in its petition for rehearing en banc which led to the *Barrera–Echavarria* decision the INS relied on the fact that the petitioner was an alien seeking admission (rather than one who had entered).

**22.** In *Barrera–Echavarria,* we concluded that the statutes there at issue, which applied only to the detention of excludable aliens, allowed for the long-term detention of such aliens, *id.* at 1445, and went on to hold that such detention is constitutional. There is no inconsistency between our statutory holding in *Barrera–Echavarria* and our statutory holding here. We found the statutory authority to hold Barrera–Echavarria for a prolonged period implicit in the history and structure of several provisions granting broad discretion to the Attorney General to parole excludable aliens into the country under certain circum-

stances. *Id.* at 1445–48. We noted that the parole of excludable aliens had always been the exception rather than the rule, and that releasing such aliens *into* the country pending deportation would run contrary to the basic statutory scheme precluding such entry. *Id.* at 1447. In the case before us, we consider the entirely different question of aliens who have already entered the country. Thus, unlike in *Barrera–Echavarria,* there is no long-standing statutory scheme that would be "upset" by barring prolonged detention here. *Id.* at 1446. Most important, because in *Barrera–Echavarria* the various statutory provisions at issue did not apply to the detention of aliens who had already entered the United States, there was no need to invoke the canon of constitutional avoidance. The constitutional result in *Barrera–Echavarria* was dictated by the Supreme Court's holding in *Mezei* regarding *excludable* aliens.

erty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." (citations omitted)); *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958) (stating that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry' "); *cf. Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (holding that illegal alien children have constitutional right to education).[23] Unlike the petitioners in *Mezei* and *Barrera–Echavarria,* Ma was admitted to and entered the United States as a refugee when he was a child, and has lived here ever since. He does not seek to "force us to admit him." *Mezei,* 345 U.S. at 210, 73 S.Ct. 625. The cases involving indefinite detention of excludable aliens simply do not support the constitutionality of indefinite detention of aliens who have entered the United States. To the contrary, our case law makes clear that, as a general matter, aliens who have entered the United States, legally or illegally, are entitled to the protections of the Fifth Amendment.[24]

The INS also argues that *Barrera–Echavarria* and *Mezei* control the result here because, for constitutional purposes, an alien ordered removed has no further right to be here and therefore stands on essentially the same footing as an excludable alien.[25] While this novel theory would dispose of the constitutional question

---

**23.** The cases extending Fifth Amendment protection to aliens are fully consistent with our general jurisprudence granting significant constitutional protections to aliens within the territory of the United States. The Supreme Court has held that the Equal Protection Clause applies to aliens, *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), that the Fourth Amendment applies to aliens (within U.S. territory), *Almeida–Sanchez v. United States,* 413 U.S. 266, 274, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), and that the First Amendment applies to aliens. *Bridges v. Wixon,* 326 U.S. 135, 148, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (holding that "freedom of speech and of press is accorded aliens residing in this country"); *Bridges v. California,* 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941) (same).

**24.** The INS cites *Fong Yue Ting v. United States,* 149 U.S. 698, 711–13, 13 S.Ct. 1016, 37 L.Ed. 905 (1893), for the proposition that "[t]he power to exclude aliens, and the power to expel them, rest upon one foundation, are derived from one source, are supported by the same reasons, and are in truth but parts of one and the same power." *Id.* at 713, 13 S.Ct. 1016. However, that proposition as applied to the distinction between the constitutional rights of deportable and excludable aliens is no longer good law. The Court in *Fong Yue Ting* went on to hold that aliens may be deported using processes exercised "entirely through executive officers." *Id.* at 714, 13 S.Ct. 1016. That part of *Fong Yue Ting* 's holding was overruled ten years later, when the Supreme Court held that deportation proceedings for aliens within the U.S. must conform to due process. *Yamataya v. Fisher,* 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903).

**25.** We note that the Fifth Circuit relied on the INS's argument in resolving the constitutional question we avoid today, holding that long-term detention of removable aliens who have been ordered deported does not violate substantive due process. *Zadvydas v. Underdown,* 185 F.3d 279 (5th Cir.1999). Although we seriously question the Fifth Circuit's conclusion in that case, and in particular its reading of *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896), and *Landon v. Plasencia,* 459 U.S. 21, 32–34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), we need not reach the constitutional question here. At the very least, it is clear from reading *Zadvydas* that a substantial constitutional question exists regarding the construction of § 1231(a)(6).

raised by indefinite detention of such resident aliens, we cannot easily reconcile it with controlling case law. In particular, the INS's position appears to be clearly inconsistent with the Supreme Court's holding in *Wong Wing* that illegal aliens within the territorial jurisdiction of the U.S. who had been ordered deported could not be put to hard labor prior to their deportation. *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896). Although the INS argues that *Wong Wing* establishes only the proposition that irrational abuses against aliens who have been ordered deported are unjustified, *Wong Wing* makes clear that Congress deliberately created the hard labor policy "to promote its policy in respect to Chinese persons"(presumably by creating deterrence and encouraging voluntary departure). *Wong Wing,* 163 U.S. at 235, 237, 16 S.Ct. 977. The Court said nothing about "irrationality," only unconstitutionality. In short, it unanimously struck down, on Fifth Amendment grounds, Congress'

policy with respect to aliens who had been ordered deported even though that policy was passed in furtherance of legitimate immigration goals. *See also Landon v. Plasencia,* 459 U.S. 21, 32–34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (holding that resident alien has due process rights in exclusion proceedings because her "constitutional status" is greater than that of a first-time entrant); *Johnson v. Eisentrager,* 339 U.S. 763, 771, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (holding that the Fifth Amendment grants rights to aliens within the territorial jurisdiction of the U.S., but not to those outside the territory). In order to adopt the INS's approach here, we would have to reconcile *Wong Wing,* which affords constitutional protection to aliens who have been ordered deported, with the INS's suggested rule—which would (by extending the constitutional jurisprudence governing excludable aliens to such aliens) strip them of such protection. That would be a daunting, if not impossible, task.[26]

---

Following oral argument, the Tenth Circuit considered the constitutional question in *Ho v. Greene,* 204 F.3d 1045 (10th Cir.2000), and, by a 2–1 vote, accepted the Fifth Circuit's view. Moreover, the Tenth Circuit concluded that because § 1231(a)(6) was silent as to any time duration, "Congress intended to and expressly did authorize the Attorney General to indefinitely detain certain removable aliens." *Id.* at 1057. For the reasons stated below, we do not find the Tenth Circuit's reasoning persuasive.

26. The INS also argues that all immigration-related decisions are entitled to substantial deference under the plenary power, citing *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). However, it is not clear what role the plenary power played in *Flores.* In that case, the Court found that rational basis review applied, noted that the plenary power was applicable, but then stated that "[o]f course, the INS regulation must still meet the (unexacting) standard of rationally advancing some legitimate governmental purpose." *Flores,* 507 U.S. at 306, 113 S.Ct. 1439. Ma argues that the plenary power's general deference rule does not apply in every

case, citing *INS v. Chadha,* 462 U.S. 919, 940–41, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (striking down law governing suspension of deportation, stating that "what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing [the plenary] power.... Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, so long as the exercise of that authority does not offend some other constitutional restriction."(internal citation omitted)) and *Hampton v. Mow Sun Wong,* 426 U.S. 88, 99–101, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) (striking down Civil Service Commission's blanket ban on employing non-citizens and rejecting contention that "the federal power over aliens is so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens"). It is not clear why the plenary power's deference rule should apply here given that such deference was not afforded in *Chadha* or in *Hampton.* In any event, the Supreme Court's cases make clear that the plenary power doctrine does not apply in the same way to each case to

It is clear that the INS's effort to extend exclusion law to aliens who have entered the United States but have been ordered removed raises a substantial constitutional question, at the very least. Even if we were to agree with the Fifth Circuit's constitutional holding—and we do not by any means suggest that we do—we would first be required to answer that question. As we may avoid doing so by giving the statute a construction that does not require us to undertake any constitutional inquiry, we follow that course here.

■■■■■ We believe the construction of § 1231(a)(6) we adopt—that the INS may detain aliens who have entered the country but have been ordered removed only for "a reasonable time" beyond the ninety day statutory removal period, and specifically, that such aliens may not be detained beyond that time if there is no reasonable likelihood that their country of origin will permit their return in the reasonably foreseeable future—to be the most plausible reading of the statute. However, we note that, in order to avoid the substantial constitutional concerns presented by the INS's interpretation, we could adopt a strained construction of the statute, one that would not otherwise constitute sound statutory construction. As one of our learned colleagues recently explained,

> [S]tatutory construction and constitutional narrowing ... are, in fact, very different animals.... Constitutional narrowing seeks to add a constraint to the statute that its drafters plainly had not meant to put there; it is akin to partial invalidation of the statute. *See, e.g., Regan v. Time, Inc.,* 468 U.S. 641, 652–654, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984). In performing the former task we may not add anything to the statute that is not already there ... in performing the latter function, we must do precisely that.... In performing our con-

stitutional narrowing function, we may come up with any interpretation we have reason to believe Congress would not have rejected.

*United States v. X–Citement Video, Inc.,* 982 F.2d 1285, 1295 n. 6 (9th Cir.) (Kozinski, J., dissenting), *rev'd* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). In reversing the majority, the Supreme Court endorsed our dissenting colleague's approach, holding that a statute should be construed to avoid constitutional problems so long as the saving construction is not "plainly contrary to the intent of Congress." 513 U.S. at 78, 115 S.Ct. 464. The discussion which follows will make clear that the construction we adopt is by no means plainly contrary to Congress's intent, but is instead the most reasonable interpretation of the statute.

### IV.

The interpretation we give section 1231(a)(6) is clearly the most reasonable one. The provision that the INS may hold individuals "beyond" a specified time demonstrates Congress's intent that the otherwise applicable time limit not be deemed absolute in all cases, and that the agency have *some* flexibility in instances in which additional time may be useful. It does not demonstrate an intent to give the INS any greater authority than that—and certainly not an intent to permit the agency to hold people in detention for the remainder of their lives. Such is surely the case with respect to aliens who have entered the country and are generally entitled to the protections of our Constitution. It would indeed be surprising were Congress to attempt to authorize permanent or indefinite detention of such persons simply by providing that they may be held *beyond* a ninety day period. Some greater degree of specificity or demonstration of Congres-

---

which it is relevant, and that its exercise is

subject to constitutional restraints.

sional intent would be necessary before we would conclude that a statute had granted the INS so sweeping a power with regard to persons who are generally subject to the protections of the Constitution. We cannot presume that Congress would authorize so drastic a limitation on the rights of such aliens by so indirect a means, particularly when it could have easily included express language to that effect in the statute.[27]

To sustain the INS' indefinite detention theory we would be required to read far more into the statute than its language implies. In the simplest terms, to say that the INS may hold persons *beyond* a particular date does not answer the question "for how long?". The proper reading, we conclude, is that Congress intended only that the short statutory period during which detention is ordinarily authorized not serve as an absolute barrier to a reasonable extension of time when circumstances render an additional period necessary in order to accomplish the statutory purpose—the removal of the alien. Where no removal in the reasonably foreseeable future is possible, however, the statutory language, properly construed, does not authorize indefinite detention of such aliens. Because, here, there is no repatriation agreement and no demonstration of a reasonable likelihood that one will be entered

into in the near future, we believe it to be not only the prudent but the correct interpretation of the statute to hold that Ma and others similarly situated aliens must be released, under supervision, at the end of the presumptively reasonable detention period.

## V.

Our conclusion that a "reasonable time" limitation is implicit in the statute is supported by a venerable line of Ninth Circuit cases that held that a predecessor provision must be construed as allowing only for detention "reasonably" beyond the removal period.

Prior to 1952, the detention of aliens pending deportation was governed by the Immigration Act of 1917. That statute set no time limit to accomplish a deportation. The Act provided simply that deportable aliens should be "taken into custody and deported."[28] Then, just as now, there were cases involving aliens who could not be deported for various reasons—because the U.S. had no repatriation agreement with their country, because their country would not take them back, or because they were stateless. In several cases, this court held that while the deportation order would remain valid indefinitely, detention was justified only for a reasonable period.

27. In the prior statute, Congress used language prohibiting release (subject to some exceptions) rather than the language authorizing detention used here. *See* 8 U.S.C. § 1252(a)(2)(B) (1995) (stating that the "Attorney General *may not release* [deportable aliens convicted of an aggravated felony] ... *either before or after* a determination of deportability [subject to some exceptions].") (emphasis added). The two custody provisions that succeeded the 1995 version of this law (and preceded the current version) did not change this language in any way relevant to our analysis. The same "may not release ... either before or after" language was in both statutes. *See* AEDPA § 440(c); IIRIRA § 303(b)(3) (the transitional custody rule).

The prohibitory language used there is obviously far stronger than the permissive language used in the new law. More important, however, Congress is familiar with time limitations in the detention and removal context, and could easily have authorized detention "without limitation" or "indefinitely" if it so desired. *See, e.g.,* 8 U.S.C. § 1231(a)(1)(A); 1231(a)(1)(C); 1231(b)(2)(C); 1231(b)(2)(D); 1231(c)(3)(A); 1231(c)(3)(B) (all specifying various time periods in detention and removal context).

28. *See* An Act To Regulate the Immigration of Aliens to, and the Residence of Aliens in, the United States, ch. 29, § 19, 39 Stat. 874, 889 (1917).

For example, in *Caranica v. Nagle*, 28 F.2d 955 (9th Cir.1928), the alien challenged an order mandating his deportation to Greece on the ground that he was a Macedonian citizen, not a Greek citizen. *Id.* at 956. The court upheld the order, holding that the statute allowed for deportation to Greece. The court held that the Secretary of Labor had broad discretion to find an appropriate country of deportation, but added that "the utmost the courts can or will do is to discharge the appellant from further imprisonment if the government fails to execute the order of deportation within a reasonable time." *Id.* at 957; *see also Saksagansky v. Weedin*, 53 F.2d 13, 16 (9th Cir.1931) (upholding deportation order to Russia (but not to China) and holding that petitioner must be released if he could not be deported to Russia); *Wolck v. Weedin*, 58 F.2d 928, 930–31 (9th Cir.1932) (upholding deportation order, but ruling, consistent with administrative practice, that alien should be released if deportation could not be effected within a reasonable time). *See also United States ex rel. Ross v. Wallis*, 279 F. 401, 403 (2d Cir.1922) (requiring release if deportation could not be effected within reasonable period).[29]

We recognized the continuing vitality of this rule in a case applying the 1917 Act that we decided in 1954. *Spector v. Landon*, 209 F.2d 481 (9th Cir.1954). In *Spector*, the petitioner was an alien who had been ordered deported in 1930, almost a quarter of a century earlier, and had been out on bond for most of the intervening period, but whose deportation the government had been unable to accomplish for various diplomatic reasons. *Id.* at 482. He argued that as a result of the passage of time the deportation order was no longer valid. We rejected this contention, stating that

> No cases have been found by counsel holding that a deportation warrant becomes invalid or unenforceable through mere lapse of time.... There are a number of decisions in habeas corpus to the effect that *the right to hold the alien in custody under a deportation warrant persists for no more than a reasonable period.* But such holdings lend no color to the contention made here.

*Id.* (emphasis added) (citations omitted). Thus, even as we denied Spector's claim, we recognized that the 1917 Act did not authorize indefinite detention pending deportation even though the statute did not, by its terms, place any temporal limit on the government's authority; we read the statute as containing an implicit provision that detention was authorized only for a "reasonable period."

While these older cases did not interpret a statute exactly like the one we consider today, because the 1917 Act made no distinction between aliens whose release following the removal period was required and aliens who could be detained following that period, both the 1917 statute and the current law provide for custody pending deportation and set forth no specific time limitations as to the period of detention. Although these older cases do not make their reasoning entirely explicit, they appear to rely on the principle that, when faced with the absence of an express time limitation, courts should ordinarily not assume that Congress intended a result as harsh and constitutionally dubious as indefinite detention. That principle seems as valid today as it was under the 1917

---

**29.** Notably, the "reasonable time" allowed to effectuate deportation in such cases seems to have been quite short by contemporary standards. In *Caranica* the court held that a two month deadline was not an abuse of discretion, 28 F.2d at 957, while in *Wolck* the court gave the government thirty days to implement the order, 58 F.2d at 931; in *Wallis* the Second Circuit required release after four months. 279 F. at 404.

Act. We too are faced with a statute that does not contain an express statutory proscription against release. Like the courts interpreting the 1917 Act, we assume that the statute implicitly provides for a reasonable limitation on the length of detention. In doing so, we refuse to presume that Congress authorized the indefinite detention of resident aliens long after they have finished serving their sentence merely because their country does not have a repatriation agreement with the United States.

## VI.

■ In interpreting the statute to include a reasonable time limitation, we are also influenced by amicus curiae Human Rights Watch's argument that we should apply the well-established *Charming Betsy* rule of statutory construction which requires that we generally construe Congressional legislation to avoid violating international law. *Weinberger v. Rossi,* 456 U.S. 25, 32, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) (citing *Murray v. The Charming Betsy,* 6 U.S. (2 Cranch) 64, 117–118, 2 L.Ed. 208 (1804)). We have reaffirmed this rule on several occasions. In *United States v. Thomas,* 893 F.2d 1066, 1069 (9th Cir.1990), we explained that we adhere to this principle "out of respect for other nations." *Id.* at 1069 (citing *Chua Han Mow v. United States,* 730 F.2d 1308, 1311 (9th Cir.1984)); *see also In re Simon,* 153 F.3d 991, 998 (9th Cir.1998).

■ We recently recognized that "a clear international prohibition" exists against prolonged and arbitrary detention. *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1384 (9th Cir.1998).[30] Furthermore, Article 9 of the International Covenant on Civil and Political Rights (ICCPR), which the United States has ratified, *see* 138 Cong. Rec. S4781–84 (Apr. 2, 1992), provides that "[n]o one shall be subjected to arbitrary arrest and detention." *See* International Covenant on Civil and Political Rights, *opened for signature,* Dec. 19, 1966, 999 U.N.T.S. 171, 21 U.N. GAOR Supp. (No. 16) at 54, *entered into force* Mar. 23, 1976, at Art. 9(1); *see also Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 252, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) (holding that ambiguous Congressional action should not be construed to abrogate a treaty).

In the present case, construing the statute to authorize the indefinite detention of removable aliens might violate international law. In *Martinez,* 141 F.3d 1373, we expressed our approval of a district court decision in this circuit holding that "individuals imprisoned for years without being charged were arbitrarily detained" in violation of international law, *id.* at 1384 (citing *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1541 (N.D.Cal.1987)). Given the strength of the rule of international law, our construction of the statute renders it consistent with the *Charming Betsy* rule.

---

**30.** This court has held that within the domestic legal structure, international law is displaced by "a properly enacted statute, provided it be constitutional, even if that statute violates international law." *Alvarez–Mendez v. Stock,* 941 F.2d 956, 963 (9th Cir.1991) (involving prolonged detention of excludable aliens); *see also Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1451 (9th Cir.1995). Those rulings, however, do not suggest that courts should refrain from applying the *Charming Betsy* principle. Rather, they stand for the proposition that when Congress has clearly abrogated international law through legisla-

tion, that legislation nonetheless has the full force of law. *See Restatement (Third) of International Law* § 115(1)(a) ("An Act of Congress supercedes an earlier rule of international law or a provision of an international agreement as law of the United States if the purpose of the act to supercede the earlier rule or provision is clear and if the act and the earlier rule or provision cannot be fairly reconciled"). Although Congress *may* override international law in enacting a statute, we do not presume that Congress had such an intent when the statute can reasonably be reconciled with the law of nations.

## Conclusion.

In the face of these compelling statutory arguments, we do not read § 1231(a)(6) as authorizing the indefinite detention of removable aliens. Rather, we hold that the statute authorizes the Attorney General to detain removable aliens only for a reasonable time beyond the ninety day removal period. While we could reach this construction of the statute simply by invoking the doctrine of constitutional avoidance, it is not necessary to rest our decision on that legal principle. As the above discussion makes clear, ordinary tenets of statutory construction lead us to that same result. What constitutes a reasonable time will depend on the circumstances of the various cases. The Supreme Court has now held that there shall be a presumptively reasonable period of six months during which an alien may be detained pending removal. After this six-month period, the alien can no longer be held if removal is not likely to occur in the reasonably foreseeable future. The Court also concluded that what counts as the "reasonably foreseeable future" diminishes as the time of confinement increases. *Zadvydas*, 121 S.Ct. at 2505.

In Ma's case, the district court did not err in concluding that there is not a reasonable likelihood that the INS will be able to remove Ma to Cambodia. Although the INS offered evidence that the State Department has submitted a proposal for a repatriation agreement to the Cambodian government, both sides agree that the United States has no functioning repatriation agreement with that country, that the Cambodian government does not presently accept the return of its nationals from the United States, and that it has not announced a willingness to enter into an agreement to do so in the foreseeable future, (or indeed at any time). Under these circumstances, we affirm the district court's finding that there is no reasonable likelihood that the INS will be able to accomplish Ma's removal in the reasonably foreseeable future.[31] Ma's detention has already lasted well beyond the six-month "presumptively reasonable" period established by the Supreme Court in *Zadvydas*. Under these circumstances, the INS may not detain Ma any longer.

We stress that our decision does not leave the government without remedies with respect to aliens who may not be detained permanently while awaiting a removal that may never take place. All aliens ordered released must comply with the stringent supervision requirements set out in 8 U.S.C. § 1231(a)(3). Ma will have to appear before an immigration officer periodically, answer certain questions, submit to medical or psychiatric testing as necessary, and accept reasonable restrictions on his conduct and activities, including severe travel limitations. More important, if Ma engages in any criminal activity during this time, including violation of his supervisory release conditions, he can be detained and incarcerated as part of the normal criminal process.[32]

---

**31.** We note that our construction of the statute does not require us to "second-guess" or otherwise interfere with the foreign policy actions of the United States government. On the contrary, we have taken at face value the evidence submitted by a State Department officer regarding the status of the government's attempts to establish a repatriation agreement with Cambodia. He has candidly stated that he cannot predict when a repatriation agreement will be established and begin to function.

**32.** We note that the regulations governing Ma's release state that he can be detained for violating them, and moreover that violations of supervisory release conditions are punishable by fine and/or imprisonment under 8 U.S.C. § 1253(b).

For the foregoing reasons, the district court's decision is

AFFIRMED.