Jose Antonio FRANCO–GONZALES, et al., Petitioner,

v.

Eric H. HOLDER, Jr. Attorney General, et al., Respondents.

Case No. CV 10–02211 DMG (DTBx).

United States District Court, C.D. California.

May 4, 2011.

John David Blair–Loy, Sean Riordan, ACLU of San Diego & Imperial Counties, San Diego, CA, Michael H. Steinberg, Alexa M. Lawson–Remer, Antonia Stamenova–Dancheva, Damion D.D. Robinson, Theresa A. Buckley, Sullivan & Cromwell LLP, Ahilan T. Arulanantham, ACLU Foundation of Southern California, James J. Preis, Mental Health Advocacy Services Inc., Judy London, Talia R. Inlender, Public Counsel, Los Angeles, CA, Judy Rabinovitz, American Civil Liberties Union Immigrants' Rights Project, New York, NY, Matt Adams, Riddhi Mukhopadhyay,

Northwest Immigrant Rights Project, Seattle, WA, Shawn Joe Lichaa, Sullivan and Cromwell LLP, Palo Alto, CA, for Petitioners.

Samuel P. Go, Victor M. Lawrence, Office of Immigration Litigation—District Court Section, Erez Reuveni, Jesi J. Carlson, Neelam Ihsanullah, Nicole R. Prairie, U.S. Department of Justice, Washington, DC, Assistant U.S. Attorney LA–CV, AUSA—Office of U.S. Attorney, Los Angeles, CA, for Respondents.

## ORDER RE PLAINTIFF MAKSIM ZHALEZNY'S MOTION FOR A PRELIMINARY INJUNCTION

DOLLY M. GEE, District Judge.

This matter is before the Court on the Motion for a Preliminary Injunction filed by Plaintiff Maksim Zhalezny ("Plaintiff"). The Court held a hearing on March 7, 2011. Having duly considered the respective positions of the parties, as presented in their briefs and at oral argument, the Court now renders its decision. For the reasons set forth below, Plaintiff's Motion is GRANTED in part.

## I.

### PROCEDURAL BACKGROUND

The procedural background of this case is set forth more fully in the Court's Amended Order dated December 27, 2010, 767 F.Supp.2d 1034 (C.D.Cal.2010) [Doc. # 107] (the "December 27 Order") and will not be repeated here.

On January 14, 2011, Plaintiff Maksim Zhalezny filed a Motion for a Preliminary Injunction. On February 24, 2011, Defendants filed an Opposition. Plaintiff filed a Reply on February 25, 2011. At the March 7, 2011 hearing, the Court provided the parties with the opportunity to submit

supplemental briefing on (1) categories of non-attorneys that may be qualified to represent Plaintiff and (2) whether a guardian *ad litem* is needed to effectuate Plaintiff's legal representation. Plaintiff filed a supplemental brief on March 14, 2011 and Defendants filed a supplemental brief on March 21, 2011.

## II.

### *FACTUAL BACKGROUND*

Plaintiff Zhalezny is a 21 year-old native and citizen of Belarus. (Decl. of Ahilan Arulanantham ("Arulanantham Decl.") ¶ 4, Ex. 105.) Zhalezny won the diversity visa lottery program as a derivative of his parent's application and arrived in the United States as a Lawful Permanent Resident on January 30, 2007. (*Id.;* Decl. of Piotr Zhalezny ("Zhalezny Decl.") ¶¶ 2–3.)

On February 9, 2010, Immigration and Customs Enforcement ("ICE") placed an immigration detainer on Zhalezny. (Decl. of Neelam Ihsanullah ("Ihsanullah Decl.") ¶ 6, Ex. 13.) On April 14, 2010, Zhalezny was turned over to ICE custody and served with a Notice to Appear ("NTA") for removal proceedings. (Ihsanullah Decl. ¶ 7, Ex. 14; Arulanantham Decl. ¶ 6, Ex. 108.) The NTA charged Zhalezny with being removable under Section 237(a)(2)(A)(ii) of the Immigration and Nationality Act, as amended ("INA"), 8 U.S.C. § 1227(a)(2)(A)(ii), for having been "convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct." (Arulanantham Decl. ¶ 6, Ex. 108.) The NTA stated that Plaintiff was convicted of the following: (1) theft in violation of Cal.Penal Code § 484, on January 12, 2009 and on April 16, 2009; (2) burglary in violation of Cal.Penal Code § 459, on February 24, 2009; and (3) petty theft with priors in violation of Cal.Penal Code § 666, on August 3, 2009. (*Id.*) The NTA was filed with

the San Francisco Immigration Court on April 19, 2010. (*Id.*)

Zhalezny is currently detained at the Sacramento County Jail. (Arulanantham Decl. ¶ 4, Ex. 105.)

### A. *Zhalezny's Psychiatric Evaluation*

Zhalezny has been diagnosed with undifferentiated schizophrenia. (Arulanantham Decl. ¶ 5, Ex. 107.) Jessica Ferranti, M.D., an Assistant Clinical Professor of Psychiatry at the University of California at Davis Medical Center, conducted a psychiatric evaluation of Plaintiff at the Sacramento County Jail. (Arulanantham Decl. ¶ 5, Ex. 107.) According to Dr. Ferranti, Plaintiff is neither able to understand the nature of the immigration proceedings or the charges against him nor to represent himself in immigration proceedings. (*Id.* at 13.)

Dr. Ferranti noted that Plaintiff failed to express any understanding that he is currently facing deportation and gave incongruous responses to questions about the nature of his legal proceedings. "Due to severe mental illness, Mr. Zhalezny was unable to rationally discuss a possible defense strategy." (*Id.*) Dr. Ferranti further noted that Plaintiff's psychosis manifests with "severe thought process impairment." (*Id.*) Plaintiff exhibited preoccupation with his perceptual disturbance, *i.e.*, his belief that he was being killed by the fluorescent lights in the jail and that he heard voices coming from the lights, as well as a disorganized thought process and preoccupation with delusions. (*Id.* at 14.) Due to schizophrenia, Plaintiff lacks sufficient contact with reality and the ability to make consistent decisions. (*Id.*)

### B. *Immigration Court Proceedings*

Plaintiff's first removal hearing took place before Hon. Michael J. Yamaguchi,

Judge of the San Francisco Immigration Court, on April 28, 2010. (Ihsanullah Decl. ¶ 8, Ex. 15.) Defendants present evidence that in the master calendar hearings that ensued, Judge Yamaguchi made several inquiries into obtaining *pro bono* counsel for Plaintiff and securing the presence of Plaintiff's parents at the hearings. Judge Yamaguchi delayed scheduling Plaintiff's merits hearing while such efforts were on-going.

On June 8, 2010, with Plaintiff's parents present, Judge Yamaguchi continued Plaintiff's hearing until June 30, 2010 in order to provide Plaintiff's parents with time to find an immigration attorney to represent Plaintiff. (*Id.* at 51.) On June 30, 2010, Plaintiff's father, Piotr Zhalezny, informed Judge Yamaguchi that he had been unable to secure an attorney and requested additional time. Judge Yama-guchi informed Piotr that he would consid-er appointing Piotr pursuant to 8 C.F.R. § 1240.4:

> Q: ... the law allows you as the—as the respondent—as Maksim's father to represent, to step into his shoes, to act on his behalf. What I could do is give you the application for asylum to you today, today—give you the application. And you could continue looking for an attorney, but while you're looking, you could fill out the papers for your son. And if you're unsuccessful—I'll give you one more continuance to try to find an attorney—but if you're unsuccessful, I'll have to appoint you as his representa-tive. And then what you could do then is present his case for him as if you were him. I assume he was very young when you left. Belarus. So, it's frankly much of what is—what fear he may have in Belarus is based upon you and your wife's experiences there, is that correct?

> A: Yes.

(*Id.* at 54.)

Judge Yamaguchi then asked Piotr if he consented to acting as his son's represen-tative:

> JUDGE: Sir, I am going—I have made a finding that your son is not competent to represent himself. Now, my finding doesn't mean that I find that—I'm not a medical professional, so I'm not saying your son is mentally ill. What I'm saying though legally that he doesn't have the full mental capacity to represent himself, to do the things nec-essary to protect his interests. So, that's why I'm going to appoint you to be his—to represent him, to step into his shoes. Do you understand?

> A: Yes.

> Q: And you're willing to do that?

> A: Very much so. Yes, it's my duty to do that.

(*Id.* at 109.)

At the November 1, 2010 hearing (the "November 1 Hearing"), the ACLU of Southern California submitted a friend of the court letter (the "ACLU's Letter") ex-pressing "concerns about the fairness of [Plaintiff's] removal proceedings and to recommend that those proceedings be con-tinued to a future date." (Arulanantham Decl. ¶ 8, Ex. 110.) In the ACLU's Letter, Jennifer Stark, on behalf of the ACLU, stated:

> Because of our concerns about Mr. Zha-lezny's mental health and apparent com-petency issues, my office is engaging in litigation and advocacy efforts in an at-tempt to obtain counsel for him. I do not believe that he can obtain a funda-mentally fair removal hearing, including a fair adjudication of his application for

asylum, without an attorney to represent him.

(*Id.*)

At the November 1 Hearing, Judge Yamaguchi explained the ACLU's Letter to Piotr as follows:

> JUDGE: . . . this lady works with an attorney by the name of Jennifer Stark, and she is an attorney with the American Civil Liberties Union. And they are thinking about having your son join in a class action lawsuit. And that lawsuit is going to be—is filed—would be up in Sacramento, is that right?
>
> A: No, down in Central District.
>
> JUDGE: Oh, in the Central, down in Los Angeles. And generally, the nature of the proceeding is that they're seeking to have similarly situated respondents such as your son that there would be some requirement that an attorney be appointed to represent your son. That's the general nature of the lawsuit. Now, that lawsuit is different and separate from these proceedings. So, until the Court makes a ruling, I'm required to continue on to hear the nature of your application filed on behalf of your son.

(Ihsanullah Decl. ¶ 8, Ex. 15 at 118.) Judge Yamaguchi then set the case for a February 17, 2011 merits hearing. (*Id.* at 120.)

It was at the November 1 Hearing that Piotr met Asel Aliyasova, one of the co-counsel representing Plaintiff in the present action. (Ihsanullah Decl. ¶ 10, Ex. 17; Deposition of Piotr Zhalezny ("Zhalezny Depo.") p. 78.) After the November 1 Hearing, Piotr spoke with Ms. Aliyasova and asked her what the organization was and whether she would be able to help. (Ihsanullah Decl. ¶ 10, Ex. 17; Zhalezny Depo. p. 85.) Piotr recounted the events as follows:

> A. Yeah. I asked her as to what the organization was and whether she was— she would be able to help.
>
> Q. And later that evening you determined to write this letter as Exhibit 1, is that correct?
>
> A. Well, I went home and I told my wife that the judge made a decision and I made a decision to represent my son. And then I told her let's think as to where [sic] I would be able to do it. And I mentioned that there is this organization that was willing to help us free of charge.
>
> Q. And what organization was that?
>
> A. I can't tell you for sure what it's called in English.
>
> Q. ACLU?
>
> A. Yes, something like that. I need to take a look at the paperwork.

(Ihsanullah Decl. ¶ 10, Ex. 17; Zhalezny Depo. pp. 85–86.)

Thereafter, in a letter dated November 8, 2010 to the Immigration Court, Piotr stated that he would not be able to serve as his son's representative:

> When I came to home after court, I understood that I do not have the abillity [sic] to do this part of job. I don't have any practice or education, I don't understand the process. I don't [sic] exactly what clueses [sic] I need to prepare in order to help my son. I'm informing you, your honor that I can't carry out this representative job. I will try to find another way to help him.

(Arulanantham Decl. ¶ 9, Ex. 111; Zhalezny Decl. ¶ 15.) On November 18, 2010, Plaintiff's father sent a second letter to the Immigration Court requesting Plaintiff's release pending his immigration proceedings so that Plaintiff could be treated for illness and looked after at home. (Arulanantham Decl. ¶ 10, Ex. 112; Zhalezny Decl. ¶ 17.)

On February 22, 2011, Defendants filed a Notice of Clarification informing the Court that Plaintiff's immigration hearing, originally scheduled for February 17, 2011, was re-calendared for March 24, 2011. [Doc. # 137.] On March 21, 2011, Defendants filed yet another Notice informing the Court that Plaintiff's immigration hearing was rescheduled for May 2, 2011 at 1:00 p.m. [Doc. # 163.]

## III.

### DISCUSSION

The December 27 Order sets forth the standard the Court must apply when considering a motion for preliminary injunction. Suffice it to say that the same standard governs the current motion.

Plaintiff seeks an order from the Court (1) appointing a Qualified Representative to represent Plaintiff in all aspects of his immigration proceedings, whether *pro bono* or at Defendants' expense, and (2) requiring Plaintiff to be released within 30 days unless the Government provides Plaintiff with a bond hearing at which the Government must show that Plaintiff's ongoing detention is justified. Defendants urge the Court to decline to define "Qualified Representative" prior to the Board of Immigration Appeals' ("BIA") ruling in the cases of Plaintiffs Martinez and Khukhryanskiy and to afford the agency the opportunity to provide initial guidance to the Immigration Courts and the Department of Homeland Security ("DHS").

The Court is mindful of the narrow purpose of preliminary injunctive relief and that the Court's power should be exercised only after considering the individualized circumstances presented in each case. Plaintiff is entitled to injunctive relief only to the extent he is able to demonstrate that he is both likely to succeed on the merits of his claim and that he is likely to suffer irreparable harm in the absence of such relief. In this case, Defendants have at least twice continued Plaintiff's individual hearing before the Immigration Judge. Moreover, the Court assumes that the parties would have informed the Court if the May 2, 2011 hearing had not been continued. In view of the apparent ease with which Defendants have been able to do so, the Court does not find that Plaintiff is likely to suffer irreparable harm in the absence of this Court's action with respect to the timing of Plaintiff's individual hearing. Should Defendants fail to, or be unable to, secure an appropriate continuance of Plaintiff's merits hearing before the Immigration Court, the parties shall notify this Court immediately. In any event, the Court's December 27 Order and today's ruling should provide adequate guidance to the parties regarding the Court's expectations as to who would be a Qualified Representative for any rescheduled merits hearing before the Immigration Court.

As discussed in greater detail below, however, Plaintiff has been in ICE custody for more than one year, a "prolonged" period by the Ninth Circuit's measure. Insofar as Plaintiff's detention will continue to be prolonged indefinitely by Defendants' failure to provide him with a custody hearing, and in light of the ongoing irreparable harm Plaintiff faces as a result, the Court must decide the merits of Plaintiff's custody hearing claim and whether Plaintiff is entitled to a Qualified Representative at such hearing.

### A. *Plaintiff Is Likely To Succeed On The Merits Of His Claims*

Defendants do not challenge the fact that Plaintiff is a "qualified individual with a disability" as defined by the Rehabilitation Act and that Plaintiff has established a *prima facie* case under Section 504. As in the case of Plaintiffs Aleksandr Petro-

vich Khukhryanskiy and Ever Francisco Martinez–Rivas, the Court therefore assumes for purposes of this Motion that a *prima facie* case under Section 504 exists.

### 1. *Plaintiff's Custody Hearing Claim*

Defendants contend that the Plaintiff fails to demonstrate that his detention is unreasonable merely because more than six months have elapsed since he was first taken into custody. According to Defendants, the length of Plaintiff's detention is attributable to the Immigration Judge's efforts to ensure a fair hearing and Plaintiff's own conduct in this action. Defendants find fault with the Court's December 27 Order to the extent that it "created" a six-month presumptively reasonable period for pre-removal detentions under 8 U.S.C. § 1226(c) notwithstanding that the six-month benchmark for post-removal period detentions under 8 U.S.C. § 1231 established by the Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) does not apply to man-

datory detentions under 8 U.S.C. § 1226(c).[1] (Defs.' Opp'n at 23.)

The Court clarifies its December 27 Order.

Section 1226(c) mandates detention during removal proceedings for a limited class of deportable aliens, including those convicted of an aggravated felony.[2] *Demore v. Kim*, 538 U.S. 510, 517–18, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). The purpose of section 1226(c) is to prevent deportable criminal aliens from fleeing prior to or during their removal proceedings and increase the chance that such aliens will be successfully removed if so ordered. *Id.* at 527–28, 123 S.Ct. 1708. As a result, detentions under section 1226(c) have "a definite termination point" and, in the majority of cases, last for less than the 90-day period contemplated by detentions under 8 U.S.C. § 1231.[3] *Id.* at 529, 123 S.Ct. 1708; *cf.* 8 U.S.C. § 1231 (governing detention following a final order of removal).

1. Defendants cite 8 U.S.C. § 1241 in their Opposition, but the Court presumes Defendants intended to refer to 8 U.S.C. § 1231, the detention statute at issue in *Zadvydas*. (Defs.' Opp'n at 23 n. 11.)

2. Section 1226(c) provides in pertinent part: The Attorney General shall take into custody any alien who—
(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or
(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
when the alien is released, without regard to whether the alien is released on parole,

supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.
8 U.S.C. § 1226(c).

3. Section 1231(a)(6) provides:

An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, *may be detained beyond the removal period* and, if released, shall be subject to the terms of supervision in paragraph (3).
8 U.S.C. § 1231(a)(6) (emphasis added). Unlike the statutes that require detention during removal proceedings and the removal period, such as under 8 U.S.C. § 1226(c), post-removal period detentions under 8 U.S.C. § 1231(a)(6) have no obvious termination point. *Zadvydas*, 533 U.S. at 697, 121 S.Ct. 2491.

The Supreme Court has emphasized that:

> the detention at stake under § 1226(c) *lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases* in which the alien chooses to appeal.

538 U.S. at 530, 123 S.Ct. 1708 (emphasis added) (holding that, while the respondent was detained "somewhat longer than the average—spending six months in INS custody," the respondent had requested a continuance of his removal hearing and therefore his detention under section 1226(c) was not unconstitutional).

The Ninth Circuit subsequently held in *Casas–Castrillon v. Department of Homeland Security*, 535 F.3d 942 (9th Cir.2008) that because section 1226(c)'s mandatory detention provision applies only to "expedited removal of criminal aliens" pending removal proceedings, it does not govern the prolonged detention of aliens awaiting judicial review of their removal orders. *Casas–Castrillon*, 535 F.3d at 947–48. In *Casas–Castrillon*, the petitioner had been detained for nearly seven years. Noting the Supreme Court's decision in *Demore*, the Ninth Circuit concluded that because the mandatory detention of aliens under section 1226(c) was intended to apply for only a limited time, the petitioner's section 1226(c) detention ended when the BIA affirmed his removal order. Thereafter, the authority to detain the petitioner shifted to section 1226(a).[4] *Id.* at 948.

In *Casas–Castrillon*, the Ninth Circuit additionally considered whether the government could detain an alien for a prolonged period without providing an individualized determination as to the necessity of his detention. The court

noted that although the alien's detention was permitted by statute, he may nonetheless have a right to contest before a neutral decision-maker whether the government's purported interest was actually served by his continued detention. *Id.* at 949. Emphasizing the constitutional concerns of prolonged detentions and the due process protections guaranteed to aliens in removal proceedings, the court held:

> Because the prolonged detention of an alien without an individualized determination of his dangerousness or flight risk would be 'constitutionally doubtful,' we hold that § 1226(a) must be construed as *requiring* the Attorney General to provide the alien with such a hearing.

*Id.* (italics in original).

In its December 27 Order, the Court determined that Martinez's more than one-year detention and Khukhryanskiy's eight-month detention were prolonged. In light of the Supreme Court's decision in *Demore* and the Ninth Circuit's decision in *Casas–Castrillon*, the Court concluded that (1) the authority for these plaintiffs' respective prolonged detentions shifted to section 1226(a) and (2) plaintiffs were entitled to a custody hearing and the opportunity to contest the necessity of their detentions. In doing so, the Court analogized to the reasoning in the Supreme Court's *Zadvydas* decision, in which the Supreme Court established a presumptively reasonable six-month detention period for "removal period" detentions under 8 U.S.C. § 1231. *See Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491. The Court also noted that the Ninth Circuit had extended the *Zadvydas* framework beyond post-removal period deten-

---

**4.** Section 1226(a) provides that the Attorney General "may" detain an alien "pending a decision on whether the alien is to be re-moved from the United States." 8 U.S.C. § 1226(a).

tions to those under 8 U.S.C. § 1226(a).[5] *See Rodriguez v. Hayes,* 591 F.3d 1105, 1115 (9th Cir.2010) (noting the *Zadvydas* framework had been extended to discretionary detention pursuant to 8 U.S.C. §§ 1225(b) and 1226(a)).

Indeed, the Ninth Circuit's recent *Diouf* decision bolsters this Court's ruling regarding Plaintiffs Martinez and Khukhryanskiy. *Diouf v. Napolitano,* 634 F.3d 1081 (9th Cir.2011). In *Diouf,* the Ninth Circuit held that "[a]s a general matter, detention is prolonged when it has lasted six months and is expected to continue more than minimally beyond six months." 634 F.3d at 1092 n. 13 (holding that DHS regulations governing the subsequent 180-day review raised "serious constitutional concerns," in part because when the 180-day review takes place, the alien has been detained for approximately six months and any continuing detention becomes prolonged). According to the Ninth Circuit, "[w]hen detention crosses the six-month threshold and release or removal is not imminent, the private interests at stake are profound." *Id.*

In this case, Plaintiff has been detained for a period of more than 12 months. From the outset, the Immigration Judge inquired into obtaining *pro bono* counsel for Plaintiff and securing the presence of Plaintiff's parents at the hearings, and granted continuances for that purpose. At least as of May 12, 2010, the Immigration Judge became aware that Plaintiff might be suffering from mental health problems. (Ihsanullah Decl. ¶ 8, Ex. 15 at 19–21.)

Not surprisingly, the parties characterize Plaintiff's resulting prolonged detention differently. According to Plaintiff, the lack of systemic guidelines for unrepresented mentally incompetent aliens who require reasonable accommodations in removal proceedings unnecessarily prolonged Plaintiff's detention. (Pl.'s Reply at 19.) Defendants, on the other hand, contend that the length of Plaintiff's detention does not raise constitutional concerns exactly because the Immigration Judge used continuances to ensure that Plaintiff's rights to a fair hearing were protected and that it is because of the continuances that Plaintiff's family has been allowed to fully litigate his removal.[6] These two positions are not at odds with each other. Plaintiff's detention was prolonged for both of the reasons proffered by the parties. Unfortunately, his detention was also prolonged

---

**5.** On March 7, 2011, the same date as the hearing in this case, the Ninth Circuit issued a ruling in *Diouf v. Napolitano,* 634 F.3d 1081 (9th Cir.2011), where the court considered whether individuals detained pursuant to 8 U.S.C. § 1231(a)(6) are entitled to the same procedural safeguards against prolonged detention as individuals detained under 8 U.S.C. § 1226(a). The court held prolonged detention under 8 U.S.C. § 1231(a)(6), without adequate procedural protections, would raise "serious constitutional concerns" and that, therefore, such aliens were entitled to release on bond unless the government establishes that the alien is a flight risk or will be a danger to the community. *Id.* at 1081–87.

**6.** Defendants also contend that Plaintiff's custody hearing claim is likely to fail because "Plaintiff has contributed to prolonging his own detention, by encouraging his father to attempt to withdraw as his representative and seeking an appointed counsel through this lawsuit. If Plaintiff, through federal court counsel, had not obstructed Piotr's representation in this manner, Plaintiff Zhalezny's merits hearing would have occurred on February 17, and the immigration judge might have issued a decision on his asylum application on that date or shortly thereafter." (Defs.' Opp'n at 25.) As the record indicates, however, it was the Immigration Judge who explained to Piotr the nature of the instant action. (Ihsanullah Decl. ¶ 8, Ex. 15 at 118.) Defendants present no evidence that Plaintiff encouraged his father to withdraw as his representative or that Plaintiff has acted in bad faith to prolong his own detention.

by the time needed for this Court to address the merits of the instant motion. Debating what caused the unnecessary prolongation of Plaintiff's detention, however, begs the question.

██ Plaintiff's detention falls outside the intended scope of section 1226(c) and is well-beyond the outer limit of the five-month period estimated by the *Demore* Court for mandatory detentions under section 1226(c). Particularly in light of the fact that Plaintiff remains without a Qualified Representative to represent him in his removal proceedings, the Court finds that Plaintiff's detention can no longer be classified as detention for an "expedited removal." Plaintiff has been detained for over a year and neither release nor removal is imminent. Consequently, as in the case of Plaintiffs Khukhryanskiy and Martinez, the Court finds that the authority for Plaintiff's detention is no longer that of mandatory detention under section 1226(c), but has shifted to discretionary detention under section 1226(a). In light of Plaintiff's prolonged detention and the profound private interests at stake, Plaintiff is entitled to a custody hearing at which the government must justify his continued detention on the basis that he is either a flight risk or will be a danger to the community.[7]

## 2. *Plaintiff's Representation Claim*

As mentioned *supra*, Defendants urge the Court to decline to define the concept of "Qualified Representative" prior to the BIA's ruling in the cases of Plaintiffs Martinez and Khukhryanskiy. In light of the Court's ruling that Plaintiff is entitled to a custody hearing before an Immigration Judge, however, the Court must necessarily decide who is a Qualified Representative to represent Plaintiff at that hearing.

### a. *"Qualified Representative" as Defined in the December 27 Order*

Defendants first contend that "[a]lthough attorneys are viewed as the pinnacle of legal representation, counsel is not always necessary to represent the rights of individuals, particularly in federal administrative proceedings." (Defs.' Opp'n at 13.) In fact, Plaintiff does not argue otherwise.[8] Plaintiff urges the Court to find that (1) accredited representatives and (2) law students and law graduates supervised by attorneys, as set forth in 8 C.F.R. § 1292.1, may act as Qualified Representatives for mentally incompetent immigrant detainees, including Plaintiff in this case.

In the case of Plaintiffs Martinez and Khukhryanskiy, the Court "[found] it significant that Plaintiffs themselves define[d] what they consider[ed] to be adequate rep-

---

**7.** Plaintiff's prolonged detention is even more compelling when viewed against the factors deemed relevant by the Ninth Circuit in *Diouf*. In *Diouf*, the court considered (1) the fact that a detainee sought direct or collateral review, (2) the alien's liberty interests, and (3) the government's interests in ensuring the alien's presence at his removal proceedings. In this case, Plaintiff's case is at a nascent stage and he is not yet seeking any review. Furthermore, as he is subject to detention pending removal proceedings (as opposed to any detention during the post-removal period), Plaintiff has a stronger liberty interest than a section 1231(a)(6) alien and the government has a slightly weaker interest in en-

suring Plaintiff's presence at the moment of removal. Unlike an alien who has already been ordered removed, Plaintiff is a lawful permanent resident who is facing charges of removability. A custody hearing would ensure that Plaintiff is not being detained unnecessarily pending removal proceedings.

**8.** At the December 8, 2010 hearing on the Preliminary Injunction Motion filed by Plaintiffs Khukhryanskiy and Martinez, Plaintiff's counsel conceded that the appointment of certain non-attorneys may be sufficient to safeguard Plaintiffs' rights.

resentation" and adopted the definition of a "Qualified Representative" as set forth by Plaintiffs. (December 27 Order, 767 F.Supp.2d at 1058.) There, Plaintiffs sought a representative who met five criteria, including that he or she:

> (1) be obligated to provide zealous representation; (2) be subject to sanction by the EOIR for ineffective assistance; (3) be free of any conflicts of interest; (4) have adequate knowledge and information to provide representation at least as competent as that provided by a detainee with ample time, motivation, and access to legal materials; and (5) maintain confidentiality of information.

(*Id.*) In response, Defendants engaged in vigorous efforts to secure pro bono counsel meeting each of these five criteria and filed various status reports updating the Court as to the same.

Consequently, the question of whether Plaintiffs' proposed criteria were the *only* "reasonable accommodation" for mentally incompetent immigrant detainees was not squarely before the Court. The Court, in its December 27 Order, noted that "Defendants' offer of counsel [spoke] volumes ... regarding the reasonableness of the proposed accommodation and the absence of undue burden in providing the accommodation." (*Id.* at 1057.) Accepting Plaintiffs' proposed definition of a "Qualified Representative," the Court stated:

> In view of the circumstances presented by Plaintiffs' cases, Plaintiffs' definition of a Qualified Representative, and Defendants' apparent offer of counsel that meet such criteria, the Court finds that it is a reasonable accommodation for Defendants to provide a Qualified Representative(s) to represent Plaintiffs in the entirety of their immigration proceedings, whether such Qualified Representative is performing the services *pro bono* or at Defendants' expense.

(December 27 Order, 767 F.Supp.2d at 1058.)

At this juncture, the parties urge the Court to consider whether a Qualified Representative, as defined in the December 27 Order, is the only "reasonable accommodation" for mentally incompetent immigrant detainees in removal proceedings and, in particular, for this Plaintiff's custody hearing. While the Court does not find that Plaintiff's father is an adequate representative, the Court also does not find that a Qualified Representative, as defined in the December 27 Order, must be a lawyer in order to be a "reasonable accommodation" for Plaintiff. The Court refines its definition of a Qualified Representative below.

**b.** ***Whether a Mentally Incompetent Alien Detainee Can Knowingly and Voluntarily Waive His Right to Counsel***

■ As a general matter, while aliens do not have a Sixth Amendment right to counsel in an immigration hearing, Congress has recognized a right by aliens to obtain counsel in removal proceedings before an immigration judge. *U.S. v. Ramos*, 623 F.3d 672, 682 (9th Cir.2010). Section 1362 provides:

> In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, *the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel*, authorized to practice in such proceedings, as he shall choose.

8 U.S.C. § 1362 (emphasis added). The alien's right to counsel stems from the Fifth Amendment's due process guarantee. *Ramos*, 623 F.3d at 682.

■ Consequently, immigration judges are required to (1) inquire whether the petitioner wishes counsel, (2) deter-

mine a reasonable period for obtaining counsel, and (3) assess whether any waiver of counsel is knowing and voluntary. *Id.* In order for a waiver to be valid, the immigration judge must (1) inquire specifically as to whether the petitioner wishes to continue without a lawyer and (2) receive a knowing and voluntary affirmative response. *Tawadrus v. Ashcroft,* 364 F.3d 1099, 1103 (9th Cir.2004).

Indeed, Defendants contend that the immigration judge acts as a safeguard to ensure that the alien receives a full and fair hearing and point to the immigration judge's duty to develop a full record, particularly when the alien proceeds *pro se.*

As Plaintiff's case illustrates, however, where an immigrant detainee is mentally incompetent, it is questionable whether the detainee is able to make a "knowing and voluntary" waiver of his right to counsel. In Plaintiff's case, the evidence indicates that Plaintiff's mental illness causes "severe thought process impairment" and inhibits his ability to make consistent decisions. In the only mental competence evaluation presented to the Court, Dr. Ferranti concluded that Plaintiff was unable to rationally discuss a possible defense strategy or to understand the nature of the immigration proceedings or the charges against him. For this very reason, the Court at the March 7, 2011 hearing asked the parties to additionally brief the question whether a mentally incompetent alien can consent to any representation or whether he would need a guardian to do so on his behalf.

Defendants argue (1) that consent is not required for a Qualified Representative to appear and speak for an incompetent alien under 8 C.F.R. § 1240.4 and (2) that once the Qualified Representative is established or permitted to proceed by the immigration judge, he or she can consent on the alien's behalf. As explained below, Defendants' position presents the Court with a Gordian Knot.

Defendants urge the Court to find that the persons listed in 8 C.F.R. § 1240.4 are appropriate Qualified Representatives. Section 1240.4 contemplates that in the case of mentally incompetent immigrant detainees, "the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear shall be permitted to appear on behalf of the respondent." [9] 8 C.F.R. § 1240.4. As discussed *supra,* however, mentally incompetent immigrant detainees also have a constitutional right to representation and any waiver of such right must be knowing and voluntary. If a mentally incompetent immigrant detainee were to agree to be represented by a non-attorney identified in 8 C.F.R. § 1240.4, such detainee would, in any case, be required to knowingly and voluntarily waive his right to counsel. As a result, even if the Court were to determine that all non-attorneys identified in 8 C.F.R. § 1240.4 are appropriate Qualified Representatives, whether such non-attorney can serve as a representative for a mentally incompetent immigrant detainee would depend ultimately on whether the detainee can validly waive his right to counsel and consent to certain types of non-attorney representation—a

---

9. Section 1240.4 provides as follows:
 When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent. 8 C.F.R. § 1240.4.

dubious proposition for someone who is mentally incompetent.

On the other hand, as Plaintiff indicates, federal regulations provide that a person "entitled to representation" may be represented by attorneys, law students and law graduates, reputable individuals, accredited representatives, and accredited officials. 8 C.F.R. § 1292.1. Among these categories of persons authorized by federal regulations to represent aliens in removal proceedings, only attorneys and accredited representatives may represent aliens without "the request of the person entitled to representation" under federal regulations.[10] *Compare* 8 C.F.R. §§ 1292.1(a)(2), (a)(3) (providing that (1) law students and law graduates and (2) reputable individuals may represent aliens in removal proceedings only if they are appearing "at the request of the person entitled to representation") *with* 8 C.F.R. §§ 1292.1(a)(1), (a)(4) (no requirement of a request for attorneys and accredited representatives). Plaintiff therefore argues that because law students and law graduates directly supervised by retained attorneys may represent detainees without the detainee's consent, such non-attorneys may also be appropriate Qualified Representatives.[11]

The Court finds merit in Plaintiff's position. Defendants argue that such a "blanket determination" eliminates the possibility of having other individuals such as "social workers, mental health professionals, reputable individuals, country condition experts, psychologists, or persons with college degrees" represent mentally incompetent detainees. (Defs.' Supp. Brief at 9.) The Court disagrees. Federal regulations define an "accredited representative" as

> a person who is approved by the Board to represent aliens before the Board, the Immigration Courts, and DHS. He or she must be a person of good moral character who works for a specific non-profit religious, charitable, social service, or similar organization which has been recognized by the Board to represent aliens.

Board of Immigration Appeals Practice Manual § 2.4; available at http://www.justice.gov/eoir/vll/qapracmanual/apptmtn4.htm ("BIA Practice Manual"). In order to receive accreditation, an individual must demonstrate that he or she works for a qualifying organization that "has at its disposal adequate knowledge, information, and experience in immigration law and procedure" and the qualifying organization must "set forth the nature and extent of the proposed representative's experience and knowledge of immigration and naturalization law and procedure." 8 C.F.R. §§ 1292.2(a), (d). To the extent "social workers, mental health professionals, reputable individuals, country condition experts, psychologists, or persons with college degrees" meet the qualifications, such individuals may be approved as "accredited representatives." The Court also notes that, because the issue was not presented in this motion or in Martinez/Khukhryanskiy's prior motion, this decision does not

---

**10.** Federal regulations provide that aliens in removal proceedings may be represented (1) attorneys, (2) law students and law graduates, (3) reputable individuals, (4) accredited representatives, and (5) accredited officials, all as defined therein. 8 C.F.R. § 1292.1.

**11.** Plaintiff also urges the Court to limit its definition of Qualified Representatives to people who can be held accountable for their performance. Plaintiff argues that in light of Plaintiff's disability, it is critical that anyone acting on his behalf be accountable to the courts and an accrediting body. As such, Plaintiff contends that the definition of Qualified Representatives should be limited to attorneys, accredited representatives, and law students and law graduates directly supervised by retained attorneys.

address who would be a Qualified Representative for mentally ill detainees who *are not* mentally incompetent and *are* capable of giving valid consent to representation by non-attorneys.

■ The Court therefore finds that a Qualified Representative for a mentally incompetent detainee may be (1) an attorney, (2) a law student or law graduate directly supervised by a retained attorney, or (3) an accredited representative, all as defined in 8 C.F.R. § 1292.1.

### c. *Whether Piotr is a Qualified Representative in Plaintiff's Case*

■ Defendants assert that by permitting Plaintiff's father, Piotr Zhalezny (hereinafter "Piotr") to appear on his son's behalf, the Immigration Judge ensured that Plaintiff's disability was accommodated and his procedural rights safeguarded. The Court disagrees. Plaintiff's father is not a Qualified Representative.

Defendants argue that Piotr is in the best position to speak for his son because he "obviously cares deeply" for his son's welfare, performed tasks that put plaintiff in the same position as a mentally competent alien proceeding *pro se*, and is the only known person who can relay facts that support Plaintiff's asylum application. (Defs.' Supp. Brief at 5.) While Plaintiff's father has expressed an earnest desire to assist his son in removal proceedings, as most parents would, the Court must look beyond an individual's mere willingness to take on the role of representative for a mentally incompetent person.

Setting aside the fact that Plaintiff's father does not work for a BIA recognized organization, which is a requirement for an "accredited representative," Plaintiff's father lacks "adequate knowledge, information, and experience in immigration law and procedure" to represent his son. According to Plaintiff, in the short time Plaintiff's father served as his representative, Piotr: (1) failed to assert an available basis for asylum, *i.e.*, his son's mental illness, despite being advised to do so (Ihsanullah Decl. ¶ 13, Ex. 20); (2) failed to discuss the asylum application with his son prior to filing it, despite the requirement that the preparer read the form aloud to the applicant for verification (Zhalezny Depo. pp. 49–50); (3) does not have time to represent his son because he supports his family by working full-time as a newspaper delivery-man and takes English classes (Zhalezny Decl. ¶ 2); (4) has only a basic knowledge of English and requires the services of a translator; and (5) is the primary witness in support of his son's asylum application (Zhalezny Decl. ¶¶ 2, 11, 14). Piotr lacks basic knowledge of his son's circumstances as demonstrated by the fact that he believes his son has no attorney in his criminal proceedings and he has minimal and incorrect knowledge of his son's criminal and medical history. (Zhalezny Depo. pp. 34–36; Ihsanullah Decl. ¶ 8, Ex. 15 at 101.)

Nor is there anything in the record to suggest that Plaintiff has knowingly or voluntarily waived any potential conflict between himself and his father and has consented to his father's representation. Plaintiff has repeatedly refused to obtain his father's help, despite requests from the Immigration Judge that he do so. (Ihsanullah Decl. ¶ 8, Ex. 15 at 4–5, 10–11, 13–14, 24–27, 39–40.) The record indicates that the Immigration Judge repeatedly urged Plaintiff to seek counsel or assistance from his parents and that Plaintiff refused. As a result, while it is certainly not the case that one's parent can never be a Qualified Representative, the Court finds that in this particular case, Plaintiff's father cannot serve as a Qualified Representative for Plaintiff at his custody hearing.

Defendants also make much of the argument that allowing Piotr to "speak for his son in removal proceedings . . . would essentially place the Plaintiff in the same position as that of a competent alien proceeding *pro se*." (Defs.' Supp. Brief at 6.) As discussed in the December 27 Order, however, it is well-established that an accommodation that provides a preference is not, in and of itself, unreasonable. (December 27 Order, 767 F.Supp.2d at 1055–56.) Other than arguing that the appointment of counsel for mentally incompetent immigrant detainees is "rare" and difficult due to funding concerns, Defendants fail to present any evidence why the criteria for a Qualified Representative, as set forth by the Court herein, are not a "reasonable accommodation" for one who is mentally incompetent.

In addition, far from helping their position, Defendants' exposition of the Immigration Judge's valiant *ad hoc* efforts to find *pro bono* counsel and to contact Plaintiff's parents actually undermines it. If Defendants had a system in place to identify mentally incompetent detainees and to promptly accommodate their needs by the appointment of a Qualified Representative, Immigration Judges would not be placed in the untenable position of navigating uncharted territory when confronted with mentally ill aliens in their courtrooms. In the absence of any systemic guidelines setting forth what is a "reasonable accommodation" for unrepresented mentally incompetent aliens in removal proceedings, the Court finds that the appointment of a Qualified Representative, as redefined above, is a "reasonable accommodation" for Plaintiff at his custody hearing in this case.

Finally, Defendants present evidence that Plaintiff's counsel offered to assist Plaintiff "free of charge" and urge this Court to require Plaintiff's counsel to represent him in his removal proceedings as a result. At his deposition, Piotr testified as follows:

A. Well, I went home and I told my wife that the judge made a decision and I made a decision to represent my son. And then I told her let's think as to where [sic] I would be able to do it. And I mentioned that there is this organization that was willing to help us free of charge.

Q. And what organization was that?

A. I can't tell you for sure what it's called in English.

Q. ACLU?

A. Yes, something like that. I need to take a look at the paperwork.

(Ihsanullah Decl. ¶ 10, Ex. 17; Zhalezny Depo. pp. 85–86.)

If Plaintiff's counsel herein did, in fact, offer to represent Plaintiff "free of charge" in the immigration proceedings, the Court agrees that Plaintiff's counsel should be required to fulfill its promise. It is not clear from Piotr's testimony, however, whether Plaintiff's counsel offered to "represent" Plaintiff "free of charge" in the immigration proceedings or merely to "assist" Plaintiff in securing such representation. At the hearing on this motion, the Court asked Plaintiff's counsel whether such an offer to represent Plaintiff in the immigration proceedings had been made and the response was an unequivocal denial. Plaintiff's counsel deny any claim that they "unduly influenced [Piotr] to withdraw as his son's representative, or that class counsel acted inappropriately in any way." (Pl.'s Reply at 15.) The Court finds no misconduct on Plaintiff's counsel's part for informing the Immigration Judge and Plaintiff's parents of the pendency of this case. Under these circumstances, the Court finds no basis upon which to require Plaintiff's counsel to undertake the repre-

sentation of Plaintiff in the immigration proceedings against their will.

**B.** *Plaintiff Demonstrates A Likelihood Of Irreparable Harm And The Balance Of Hardships Tips Sharply In His Favor*

 In this case, Defendants argue that Plaintiff will not suffer irreparable harm because his father may serve as an adequate representative on his behalf and Plaintiff may appeal any denial of his asylum application to the BIA. [Redacted]

As discussed above, Plaintiff has been detained for more than a year without proper representation. [Redacted] Defendants also underestimate the importance of Plaintiff's case before the Immigration Court. Even if Plaintiff has a right to appeal any denial, the record developed and established before the Immigration Court will form the basis of any such appeal. Under 8 C.F.R. § 1003.1(d)(3), the BIA does not have *de novo* review of factual questions or credibility determinations and generally does not engage in factfinding.[12]

On the evidence presented, the Court finds that the likelihood of irreparable harm and the balance of hardships tip sharply in favor of Plaintiff.

**C.** *An Injunction Is In The Public Interest And A Mandatory Injunction Is Appropriate In This Case*

 For the reasons discussed in its December 27 Order, the Court similarly finds that granting Plaintiff's Motion for a custody hearing is in the public interest. Plaintiff has met his burden of demonstrating the need for a mandatory injunction because the law and facts clearly favor him and the potential for irreparable harm cannot be undone by a later award of damages.

**IV.**

**CONCLUSION**

In light of the foregoing:

(1) The Court GRANTS Plaintiff Zhalezny's Motion for a Preliminary Injunction as follows:

Pending a trial on the merits, Defendants, and their officers, agents, employees, and attorneys are hereby enjoined from detaining Plaintiff Zhalezny under 8 U.S.C. § 1226(a) or (c) unless, within 45 days of this Order, they (i) provide Plaintiff with a bond hearing before an Immigration Judge with the authority to order his release on conditions of supervision, unless the Government shows that Plaintiff's ongoing detention is justified; and (ii)

---

**12.** Section 1003.1(d)(3) outlines the scope of the BIA's review as follows:

(i) The Board will not engage in de novo review of findings of fact determined by an immigration judge. Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.

(ii) The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo.

(iii) The Board may review all questions arising in appeals from decisions issued by Service officers de novo.

(iv) Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the Board will not engage in factfinding in the course of deciding appeals. A party asserting that the Board cannot properly resolve an appeal without further factfinding must file a motion for remand. If further factfinding is needed in a particular case, the Board may remand the proceeding to the immigration judge or, as appropriate, to the Service.

8 C.F.R. § 1003.1(d)(3).

provide Plaintiff with a Qualified Representative, as defined in this decision, who is willing and able to represent Plaintiff during such bond hearing, whether *pro bono* or at Defendants' expense.

(2) The Court waives the bond requirement. *See, e.g., Barahona–Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir.1999) (nominal security not an abuse of discretion where "vast majority of aliens [affected by class action] were very poor"); *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency,* 766 F.2d 1319, 1325 (9th Cir.1985) ("[t]he district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review").

(3) Due to privacy considerations, this Order shall be filed under seal. Within 14 days from the date of this Order, the parties will meet and confer regarding which portions of the Order they propose to be redacted such that a redacted version of the Order may be filed, or notify the Court that Plaintiff waives his privacy rights as to the confidential information relied upon herein and that the Order may be unsealed. The parties shall file a joint report with the Court by no later than May 20, 2011 regarding the sealed status of this Order.

IT IS SO ORDERED.